### MUNROE v. HARRIMAN et al. *
### No. 293.

Circuit Court of Appeals, Second Circuit.
Aug. 10, 1936.

*Writ of certiorari denied 57 S. Ct. 194, 81 L. Ed. —.

494

Conboy, Hewitt, O'Brien & Boardman, of New York City (John Vance Hewitt and Edward F. Butler, both of New York City, of counsel), for appellants.

Miller, Owen, Otis & Bailly, of New York City (Harold H. Corbin, Edward J. Bennett, and James Carroll, all of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

By this suit Charles A. Munroe seeks to recover possession of securities (shares of stock) which he lent to Joseph W. Harriman on June 14, 1932, to be used by the latter as he saw fit to secure personal loans. The lending of the securities was procured by fraud, which con-cededly gave ground for rescission of the transaction as against Harriman. The controversy is whether rescission is available against the bank, to which Harriman pledged the securities as collateral for a loan. While the suit was pending, the bank was put into liquidation and a receiver was appointed. By supplemental complaint, the receiver was made a party defendant.

Harriman was president of the bank and dominated its other officers and employees. Upon obtaining Munroe's securities he caused the bank to make a time loan of $380,000 to M. H. O. Company, Inc., one of his dummy corporations, and pledged as collateral therefor the Munroe securities plus some shares of Standard Oil stock. Later, $14,000 more was advanced on the same collateral. The proceeds of the original loan of $380,000 were used as follows: $150,000, taken from the bank at Harriman's order in anticipation of the approval of the loan, was paid to National City Bank to pay off its loan to J. A. M. A. Corporation, another dummy corporation of Harriman; $200,000 took up an existing demand note of M. H. O. Company to the bank which had been secured by the Standard Oil shares; and $30,000 discharged an existing obligation of Harriman to the bank. None of the officers or employees of the bank who took part in the making of the loan, other than Harriman, were aware that the pledged securities had been procured from Munroe by fraud. Formally, the loan was approved by other officers acting as the loan committee of the bank. The District Court found as a fact that they were completely dominated by Harriman and habitually did whatever he requested.

At the outset it should be observed that Munroe did not deal with Harriman as an agent of the bank. Harriman's request was that the securities be lent to him personally, and so they were. Nor was Harriman acting as the bank's agent in borrowing them. Hence his fraudulent representations in procuring them cannot be attributed to the bank. Indeed, no contention is made that they can. The dispute is whether Harriman's knowledge of his prior fraud upon Munroe, and of the latter's resulting equitable claim to recover possession of the borrowed stock, must as a matter of law be imputed to the bank, when it accepted the pledge of

the stock from Harriman's dummy, M. H. O. Company.

■ Aside from the effect of Harriman's "domination," to be discussed hereafter, it is clear that the bank would not be charged with knowledge of Munroe's claim. The principal is not affected by the knowledge of an agent as to matters involved in a transaction in which an agent deals with the principal or another agent of the principal as, or on account of, an adverse party. American Law Institute, Restatement, Agency, § 279. See Lilly v. Hamilton Bank, 178 F. 53, 58, 29 L.R.A.(N.S.) 558 (C.C.A.3); Kean v. National City Bank, 294 F. 214, 220 (C.C.A.6). The rules for determining when an agent's knowledge will or will not be imputed to his principal are frequently stated in terms of presumptions. Thus, in Distilled Spirits, 11 Wall. 356, 367, 20 L.Ed. 167, Justice Bradley said that it is an agent's duty to communicate to his principal the knowledge he has concerning the subject of negotiation and there is a presumption that he will perform that duty. Similarly, in American Nat. Bank v. Miller, 229 U.S. 517, 522, 33 S.Ct. 883, 57 L.Ed. 1310, where the agent's knowledge was not imputed, the reason assigned was that the law does not presume that he has performed his duty of communication when his interest is to conceal the facts. Harriman's interest required concealment from the bank of the defect in title of the securities offered in pledge. But to explain the cases in terms of presumptions is not a rational analysis. The presumption of communication is a pure fiction, contrary to the fact, for it is only when the agent has failed to communicate his knowledge that any occasion arises for imputing it to the principal. The rational explanation of the Distilled Spirits Case is that common justice requires that one who puts forward an agent to do his business should not escape the consequences of notice to, or knowledge of, his agent. Fidelity & Deposit Co. v. Courtney, 186 U.S. 342, 382, 22 S.Ct. 833, 46 L.Ed. 1193; Mechem, Agency (2d Ed.) § 1802. See, also, 65 Univ.Pa.L.R. 1, 10. But the general rule is subject to equally well established exceptions (Mechem, ibid. § 1813), one of which is that an agent's knowledge is not imputed when he is acting adversely to his principal, as in the Miller Case. The real basis for this exception was stated by Judge Taft in Thomson-Houston Electric Co. v. Capitol Electric Co., 65 F. 341, 343 (C.C.A.6): "The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." But the injustice disappears if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself. Thus, in Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956, an agent employed to procure title to land, contrary to instructions procured it with knowledge of a fraud practiced on the owner. Although the agent had an interest adverse to his principal to conceal the defect in title because his own profits would increase with the number of titles procured, his knowledge was imputed to the principal. He was the sole actor for the corporate principal in procuring the fraudulent patents. In such a case the principal is impaled on the horns of a dilemma. If he disclaims the agent's acceptance of the property for him as unauthorized, he has no ground to retain it; on the other hand, if he retains the property, he adopts the agent's act in procuring it and must in fairness take the accompanying burden of the agent's knowledge. See Aldrich v. Chemical Nat. Bank, 176 U.S. 618, 634, 20 S.Ct. 498, 44 L.Ed. 611; Ditty v. Dominion Nat. Bank, 75 F. 769, 771 (C.C.A.6); Fairfield v. Southport Nat. Bank, 80 Conn. 92, 103, 67 A. 471; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 274, 17 N.E. 496, 9 Am.St.Rep. 698; American Law Institute, Restatement, Agency, §§ 274, 282 (2) (c).

■ The situation just discussed must be carefully distinguished, however, from one where the principal buys property from an agent as an adverse party. In such case the principal's title may be traced through his own purchase or through the act of another agent, and he will have the status of a bona fide purchaser for value. Thomson-Houston Electric Co. v. Capitol Electric Co., 65 F. 341, 344 (C.C.A.6); Smith v. Boyd, 162 Mo. 146, 62 S.W. 439, 442. Thus we reach the controlling issue in the case at bar, namely, whether Harriman's domination of the loan committee was such that, although

he acted as an adversary party in offering the securities as collateral for the loan, he was also the sole representative of the bank in accepting the pledge.

The loan committee consisted of Messrs. Austin, Turner, Burke, and Jordan, in addition to Harriman. Formally, they all approved the loan by initialling the page in the committee book upon which it was recorded, but actually the loan was put through upon Harriman's instructions before it was ever brought to the attention of the committee members. Subsequently the executive committee and the board of directors confirmed the loan. With respect to loans to Harriman, or his personal corporations, the other officers and employees of the bank did without question whatever he requested, and the District Court found that they were completely dominated by him. This finding the appellants apparently do not question, nor could they do so successfully. They argue that despite such domination the law will not impute Harriman's knowledge to the bank. The case of American Nat. Bank v. Miller, 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310, is strongly relied upon. There the Macon bank was dominated by its president, Plant. To reduce his indebtedness to the Macon bank he delivered to it his check drawn on the American National Bank of Nashville, to which it was forwarded and by which the check was charged to Plant's account and credited to the Macon bank. Plant was insolvent to his own knowledge when he drew the check, and the American bank sought to rescind its credit to the Macon bank on the ground that the latter was chargeable with Plant's knowledge, but the court held otherwise. It is urged that this decision means that a corporation may without liability accept the proceeds of its dominating president's fraud even though no other responsible official exercised any independent discretion in the transaction. We do not think that it lays down so broad a rule. Although the court commented on Plant's general domination of the bank (229 U.S. 517, at page 522, 33 S.Ct. 883), it refers also (229 U.S. 517, at page 521, 33 S.Ct. 883, 884) to the fact that "the officers of the Macon bank did not know that Plant was insolvent at the time he gave the check, at the time they mailed the check, or at the time it was received by the Nashville bank." Apparently Plant's check was received by other agents of the Macon bank in the ordinary course of business and treated by them as they would have treated the check of any other borrower who sent a check to apply upon his indebtedness. In other words, Plant was not shown to have exercised his domination with respect to the particular transaction, namely, payment of his debt; as to this he dealt with the bank solely as an adverse party. In the case at bar, however, Harriman's domination was exerted to affect the action of the bank with respect to the particular transaction. His will alone caused the making of the loan and the acceptance of the collateral. Therefore he should be treated as the sole actor on behalf of the bank as fully as though he had physically placed the borrower's note and securities in the bank's vault and paid over the borrowed money without the knowledge of any other officer. Compare Anderson v. Missouri State Life Insurance Co., 69 F.(2d) 794, 795, 798 (C.C.A.6); Holden v. New York & Erie Bank, 72 N.Y. 286, 291. In such case, as already pointed out, the corporation can claim title only by virtue of the sole actor's act and must accept it burdened with his knowledge of the defect in title.

It would prolong this opinion unduly to discuss all of the cases cited by opposing counsel. It may be admitted that they cannot all be reconciled, but there is substantial authority in support of the "sole actor" doctrine.* For reasons already stated we think it is sound.

The appellants further contend that

---

* Consult Skud v. Tillinghast, 195 F..1, 7 (C.C.A.6) and cases cited; Kean v. National City Bank, 294 F. 214, 224 (C.C.A. 6); Wasmann v. City Nat. Bank, 52 F.(2d) 705, 706 (C.C.A. 6); Schneider v. Thompson, 58 F.(2d) 94, 97 (C.C.A. 8); Anderson v. Missouri State Life Insurance Co., 69 F.(2d) 794, 795, 798 (C.C.A. 6); Martin v. First Nat. Bank, 51 F. (2d) 840, 845 (D.C.Minn.); Irving Trust Co. v. State Bankers' Financial Corp., 40 F.(2d) 88, 90 (D.C.S.D.N.Y.); First Nat. Bank of Blaine v. Blake, 60 F. 78, 79 (C.C.D.Or.); Tatum v. Commercial Bank & Trust Co., 193 Ala. 120, 130, 69 So. 508, L.R.A.1916C, 767; First Nat. Bank v. Town of New Milford, 36 Conn. 93, 101; Fouche v. Merchants' Nat. Bank, 110 Ga. 827, 844-848, 36 S.E. 256; Taylor v. Felder, 3 Ga.App. 287, 59 S.E. 844, 846; Newell v. Hadley, 206 Mass. 335, 346-349, 92 N.E. 507, 29 L.R.A.(N.S.) 908;

Munroe did not disaffirm his contract with Harriman promptly on learning of the fraud and therefore lost the right to rescind it. The securities were loaned to Harriman on June 14, 1932. To assure their return Harriman deposited 1,000 shares of Harriman Bank stock which was then quoted at $600 per share. On July 7th Munroe noticed that the bank stock was being offered at about $200, and wrote Harriman that he must put up more security. About July 12th Harriman deposited with him 3,240 shares of J. A. M. A. Realty Corporation stock. Shortly thereafter Munroe discovered from the balance sheet of this corporation that its stock was worthless. He then engaged an attorney, Mr. Miller, who wrote Harriman on July 22d requesting additional collateral. On July 28th Mr. Miller saw Mr. Cooper, who had succeeded Harriman as president of the bank. He told him that the securities pledged with the bank on the M. H. O. loan were Munroe's and that unless the bank would agree to make no further advances and no rehypothecation of them he would have to ·commence appropriate legal proceedings. He did not, however, assert that Harriman had procured the securities by false representations. In fact, it does not definitely appear that Munroe or his attorney learned of the fraud until Mr. Miller examined a statement of Harriman's financial condition on September 14th, although suspicious circumstances certainly came to their attention on July 29th and early in August. A demand that the securities be returned to Munroe was made upon Harriman and the bank on September 16th. It is urged by the appellants that this was not a demand for rescission but a demand for performance of the contract, by the terms of which Harriman agreed to return the borrowed securities on September 15th "and in default thereof" agreed to pay $225,000. Although the demand did not use the word rescission, we agree with the district judge that it fixed the right to rescind as of that date. It cannot properly be construed as a demand for performance of the contract, for Harriman's duty under the contract, read literally, was to pay $225,000 since he had failed to return the securities on the 15th. If, however, the option still existed to return the securities instead of paying, it was to be exercised by Harriman not by Munroe. His demand that the bank return the securities was consistent only with rescission. The District Judge held it timely and we agree.

Judgment affirmed.

Tremont Trust Co. v. Noyes, 246 Mass. 197, 141 N.E. 93, 98; Holden v. New York & Erie Bank, 72 N.Y. 286, 294; Farmers' & T. Bank v. Kimball Co., 1 S.D. 388, 397, 47 N.W. 402, 36 Am.St. Rep. 739; Black Hills Nat. Bank v. Kellogg, 4 S.D. 312, 316–319, 56 N.W. 1071; Knobley Mountain Orchard Co. v. People's Bank, 99 W.Va. 438, 129 S.E. 474, 476, 48 A.L.R. 459. See, also, 65 U. of Pa.L.Rev. 1, 16–20. But cf. Bank of Overton v. Thompson, 118 F. 798, 799, 801 (C.C.A. 8); Dillaway v. Butler, 135 Mass. 479, 481; Indian Head National Bank v. Clark, 166 Mass. 27, 30, 43 N.E. 912; Brookhouse v. Union Publishing Co., 73 N.H. 368, 375, 62 A. 219, 2 L.R.A.(N. S.) 993, 111 Am.St.Rep. 623, 6 Ann.Cas. 675.

*Writ of certiorari denied 57 S. Ct. 232, 81 L. Ed. ——.